here this morning. We hope you all exercised your privilege of voting today, but you still have time. We just want to acquaint you with the traffic light system, which we will observe even though we only have two oral arguments this morning. When it signals two minutes, you should start winding up your argument, and when the red light comes on, you should conclude unless you're answering a question from the court. We have read the briefs and record excerpts in the case. We have not necessarily been into the record, and therefore we appreciate record citations when those are applicable. First case of the morning is number 17, 50927 Kevin Wallace v. Tesoro. We'll hear from Mr. Renner. Yes, thank you. Richard Renner, I'm here for my client Kevin Wallace, and with me is my co-counsel Chris McKinney and Alex Katzmann. This case is defined by a large number of disputed material facts. Luckily, I am not asking this Court to decide all those disputes. I am asking this Court to recognize that it was error for the district court below to pick out Kevin Wallace's witnesses and give their declarations little weight and then proceed to decide the factual contentions using Tesoro's theory of the evidence. I am also asking this Court to find that the district court abused its discretion in declaring that the testimony of Douglas Rule was expert testimony and had to be stricken because it had not been the subject of a timely notice of intent to use a subject matter expert, and then in denying Wallace's motion for leave to make a late designation of Rule as an expert. We were here three years ago after the district court had dismissed this case at the pleading level, and at that time a different panel of this Court issued what's become an important decision in whistleblower jurisprudence. The Court held that an employee who is providing information about potential fraud or assisting in a nascent fraud investigation would also be protected by Sarbanes-Oxley employee protection. The Court said that leaving these employees unprotected would have grave consequences for the statutory scheme of employee protection. No other court has said this quite this way or with such clarity about the grave consequences to the remedial purpose of SOX to make sure that investors are getting information they need to protect our economy from crises such as that brought on by Enron or the 2008 fiscal crisis. But here now, discovery is done. Tesoro is now part of Marathon, and it is claiming that its inclusion in booking of the sales taxes on their petroleum products was proper, and Wallace could not have had a reasonable belief that Tesoro executives were inflating revenue. But Tesoro's brief does concede that Wallace was investigating what they called regional pricing, kind of putting aside how the SEC and general accounting principles require that companies report their earnings segmented, segment by segment, so that investors can understand where are the profit centers within the company, so that companies can do proper analysis, and when those segment reports are off and incorrect, that misleads the investors about which segments of the company are really generating the relevant profits. And for whatever reason, the investment community and Tesoro through their bonus incentive program was looking to encourage the reporting of profits as part of marketing. That's what they wanted to show the profits. And this device of including the point of sale taxes, which include the local sales taxes and environmental and hazardous material fees, and eventually came to sometimes 50 cents on the gallon. Well, what is the gravamen of your complaint? Because it seems pretty significant to me that in Tesoro's SEC reports, they had a footnote that said, we are including the sales and excise taxes in the revenues we've, as booked. Well in the 2009 report, which was for fiscal year 2008, they only mentioned the excise taxes. And they changed that, we believe, in part in response to Kevin Wallace's concerns, for their 2009 report, which came out in early March 2010, right around the time that Wallace was being fired. So at the time Wallace was investigating and raising and pressing this concern, the reference to sales taxes was not in the footnote that was on file for their annual return. And indeed, it was only after Wallace started pressing this issue and began the granular investigation of transaction by transaction, what was happening to those by 2010, that the scope of this problem really came to light. So was that, I'm sorry. So that 2009 case statement, your client certified as accurate, are you saying that that did or did not have the footnote? I couldn't quite hear you, I'm sorry. The 2009 statement, which your client certified was accurate. On March 12, 2010. So the 2009 did not have it. When you say the 2009, you mean the Tesoro's internal reports about fiscal year 2009? The 10-K. Filing. Yeah, the 10-K. He's asking about the previous year's filing, and you're saying the footnote was different. Would you please say that for us? That's right. So on March 12, Kevin Wallace did sign off that he was not aware of any errors or violations in the reporting for 2009, but that was because the investigation, the granular nature of the investigation that his staff was working on, covered the period of January and February 2010. That's where he knew about the violations, and he took that form quite literally, because it was for fiscal year 2009, and he did not have that type of granular analysis for 2009. That's why he... What is the fiscal year end? It's the same as a calendar year, Tesoro. Oh, it is? Yes. Okay, not October 1. No. Okay. So he signs off in March of 2010... Correct. ...on the appropriateness of a disclosure in the SEC filing, which relates only to excise taxes. In 2009. 2008 and 2009, right. And then you're saying, but it makes all the difference in the world that sales taxes was not in there, and that was what he had begun investigating. I don't know about all the difference in the world, but it is a material investigation. It has to be material, and it had to be material in order to be disclosed. For the requirement to disclose it, yes, it has to be material. Right. Although that does not apply to the narrative sections of the 10-K. But I would like to Kevin Wallace was fired. Tracy Jackson in the accounting department at Tesoro directs Douglas Rule to pick up the same issue again and make sure that Tesoro is properly reporting the transfer prices among its different segments. And he discovered that, you know, this issue had been left dormant since Kevin Wallace was fired in 2010. You know, he picks it up, finds it has merit that, indeed, there is a failure to properly account for transfer prices, and that has to be fixed. And he fixes it at a cost of about $350 million in new accounting upgrades, which is what really should have happened back when Kevin Wallace raised the issue back in 2010. So we think that what Douglas Rule was saying really corroborates the merits of the concern that Kevin Wallace raised. Indeed, you know, if his concern was true, then his belief in it was reasonable. And that's what Douglas Rule establishes, particularly in a part of his declaration in paragraph 7. This is at page 2782 of the record, paragraph 7 at the last two sentences, which is a section that was not stricken. And he makes clear that when he picked up this issue, you know, there simply was no standard valid mechanism for TSORA to analyze these transfer prices, and it was done entirely ad hoc. Let me make sure I understand factually what occurred. After the magistrate district judge maybe signed off on it, too, struck different parts of this declaration, the remainder redacted was submitted, was it not? It was presented as evidence? It's in the record. Well, no. Only portions of it were stricken. But it was considered correct? Well, defense attorney, it was the parts that were stricken were not considered on summary judgment. Correct. And that, we contend, was error, because he was offering lay opinion. He was, but the part you just said that you think is so important was not stricken. So it was available. One part that was important was not stricken. Other parts that are also worthy were stricken, and we think that was material. Paragraph 7 was not stricken, you tell me. That's correct. Paragraph 7 was not stricken. So the relevance of this to the argument about Rule is what? Because it was still part of the record, still part of what was considered. That's correct. Well, I don't know that it was considered because the magistrate judge never mentioned this portion of it and said, took Tesoro's dismissive view of the evidence and said, you know, Wallace had no reasonable belief that there was misreporting to the public. And, you know, Douglas Rule's declaration, we think, significantly undercuts that. Is there any other evidence besides this declaration that the decision by your client was reasonable? Yes. We think the testimony of Tracy Chesley corroborated our client's concern. She's the one who submitted the e-mail on March 12th saying, oh, this is bad. You know, the misreporting is $30 million a year, and she says it's a train wreck on so many levels. We think that directly corroborates Kevin Wallace's concern and comes up on the very morning on which they decided to fire him, even before HR had finished its investigation of the concerns about Kevin Wallace's management. In fact, you know, Tesoro made this false claim that, oh, Moreau was a reluctant decision maker and had to go along with HR's recommendation. Well, when we did discovery, we found out HR never recommended firing Kevin Wallace and, in fact, told Moreau we haven't finished our investigation yet. We have witnesses yet to interview, including Kevin Wallace himself, but it was Moreau who rushed the decision and said we had to fire Kevin Wallace on March 12th, that same day, and did so before HR finished its investigation. Does Mr. Wallace have any response for the contention that he was insubordinate, that he told employees to disregard what Mr. Moreau was, what executives above his level were instructing him to do? Yes. Well, this is really the crux of the summary judgment decision because the magistrate judge said he was giving little weight to the declarations of Tedesco and Christy Birchers, who corroborated that Wallace was a good manager, and also the declaration of Kathy Dooley. There was corroboration here. Kevin Wallace did himself directly dispute this claim. What I'm saying, I realize that there's a high burden to bear in showing by clear and convincing evidence that the company took this action, but I still didn't see, I don't recall seeing in the briefs anything in response to the claim of insubordination. Well, I don't recall that the claim of insubordination was well defined as to who the witnesses are and what exactly Kevin Wallace did that was insubordinate, but it kind of draws on another issue that I think is important here, which is that Tesoro's making this claim that their investigation of workplace misconduct by Kevin Wallace was completely unrelated to the concerns he was raising, and a jury does not have to agree with that. The jury could find that the descriptors of this misconduct, including that he was making unilateral decisions, which I think may touch on this insubordination issue you were talking about, that he was autocratic, unwilling to compromise. A jury could look at that and say, well, that could describe someone who has the integrity to stand up and raise their concern when they these are entirely separate, and I think a jury could conclude that once Wallace started raising these concerns, the organization kind of split into factions. And this is not unusual in whistleblower cases where you have the compliance team and the let's keep violating the rules and puffing up our profits and bonuses team, and the two of them are criticizing each other. And the fact that the whistleblower is being criticized by the those who are the targets of the alleged wrongdoing does not prevent the whistleblower from winning their case. That was the Kansas Gas and Electric case in our brief. At the what exactly what position are you taking here vis-a-vis Mr. Wallace's claim? Are you taking the position that he uncovered something which was material to the SEC filing and was so material that the company finally had to correct it, or are you saying merely that the company should be liable because he had a reasonable belief that he was uncovering something that was material and had to be disclosed? I am saying both of those, and I am also saying that Kevin Wallace participated in the 1514A12. But he agreed with the certification. Yes, but he reported yes on retaliation in Question 13, and that was the answer that we contend prompted his termination. It happened the same day he got fired, you know, just hours later after he submitted that report. They walked him out the door with no advance warning, no progressive discipline in violation. Well, that's what happens sometimes when people get fired. Yes, but when the employer has a duty to show by clear and convincing evidence that they would have taken the same action without the protected activity, it gets very hard when the protected activity comes on the day of the termination, and the termination was rushed and inconsistent with the organization's normal practices. Now, what role, what's the timing and what role does this Deloitte report play in the case? The Deloitte report is part of Kevin Wallace's reasonable belief that the SAP accounting system Tesoro was relying on was inadequate for the job, that it couldn't factor out the pass-through cost the way GAAP requires organizations to do it. It is not sufficient to merely disclose, hey, our profits may include some taxes. GAAP requires that you get a handle on that, that you find out how much those taxes are and where they are properly reported. And Tesoro was not doing that. Their software was incapable of doing it. That's what the Deloitte report said, and that's why Moreau was so thorough in making sure that all copies were destroyed. And Tesoro then, you know, claimed that there were no responsive records when they were asked for them, and when, you know, we went to Deloitte then to ask for it, suddenly it showed up after the close of discovery. But the fact that they hid it and the fact that it corroborated Wallace's concern supports the claim of reasonable belief. The company, I mean, if what you say, I did not read your brief to say that the company had to make a change in its filings because of noncompliance with GAAP. Did the company ever do that? I don't know that they ever did, but I do know that once Douglas Rule finished his management of change process, Tesoro finally bit the bullet and had to pay over $350 million to upgrade their SAP system. And, you know, that is definitely material. All right. Well, thank you very much. All right. So you have time for rebuttal. Thank you, Your Honor. May it please the Court, Jonathan Franklin for the appellee. Speak up. Excuse me. Thank you, Your Honor. May it please the Court, Jonathan Franklin for the appellee. I'd like to begin with what I believe is a factual misstatement from my friend on materially the same disclosures. The filings that are in the record are for the years 2008, 2009, and 2010. Those are 10-Ks. There's also 10-Qs. If I could just give you the record citations for the year 2008. I don't believe these are cited in the brief, but they are in the record. 2275 of the record is the disclosure in 2276. 2276, so this is for the year 2008, which was before Wallace was beginning his investigation. Federal excise and state motor fuel taxes on sales by our retail segment are included in both revenues and cost of sales and operating expenses in our Statements of Consolidated Operations. It also states on 2275 that state motor fuel taxes are included in both revenues and cost of sales. And then it says what these taxes total. And it says these taxes primarily related to sales of motor fuel. That's 2008. 2009, these are the ones that he did certify, sub-certify, were correct. And then when he was terminated that same day, he certified what he claims to have related only to 2009, that there was no misreporting in 2009, contained the same, materially the same. There's maybe one word different. So that's on page 2281. You can find the first disclosure, and it's identical to the one I just read you before. 2282, and this is the 10K for the year 2009, says federal and state motor fuel taxes on sales by our retail segment are included in both revenues and cost of sales and operating expenses. And then it goes on to list exactly what those numbers are. So any shareholder that was looking at it not only knew that they were disclosed, but could actually tell you, you could look and see exactly how much they were. 2010, and this was filed shortly after he was, actually just shortly before he was terminated, no, excuse me, the 2010 filing wasn't made until after he was terminated. But that filing has the same disclosures as 2009. So that's on pages 2290 of the record and 2291. And I'm not going to read it because it's the same. Then we have the 10Qs for the third quarter of 2009, which was filed on November 9th, 2009, which would be during the period of time when he was the sub certifier. 2284, it says federal and state motor fuel taxes on sales by our retail segment are included in both revenues and cost of sales. It's the same, basically the same. And then it says what those numbers are. The 10Q for March 31st, 2010, which was filed after he was terminated shortly after, 2286, same thing. So basically there was no change here. They had the same disclosures. He wasn't reporting anything to the company that they didn't, A, already know, and B, already had fully disclosed to shareholders. Did the company modify its accounting or disclosure at any time following these years? I do not have anything past the 2010 years. But again, some of those were filed after he was terminated and they're materially the same. So you're saying this whole business about the deficiency of the SAP accounting program is a red herring or meritless or what? It's a red herring, Your Honor. It was that, to the extent that has any relevance, it relates to his looking at internal reporting by the company and what he was pulling data out of the accounting system that he thought was a discrepancy. I think if you look at Ms. Jackson's deposition, she was the accountant, when he told her, oh, I'm finding these things in the internal, not the SEC reporting. This is the internal reporting of the company. She looked at it, actually. So you can actually look at pages 2111, 2112, 2116, 2118, 2128 of the record. And what she said there is we looked at all of this and we found that, in fact, they were, and the company admits, it was including sales taxes and all other taxes in revenue, but it was also taking it out in costs. So there's no net. The net is also disclosing to shareholders. And she said, we looked at it and it was perfectly fine. She also says on 2713 to 14, we followed GAP. I don't think he mentioned GAP in his opening argument. I don't see any evidence in the record that GAP wasn't followed. When this case was before the Court the first time, the Court remanded on one narrow claim, saying that Wallace's complaint, taken as true solely for purposes of a motion to dismiss, plausibly stated a claim that he was retaliated for reporting violations of SEC laws, securities laws, relating to the reporting of taxes as revenue. But on remand, Wallace was required to substantiate those allegations with actual evidence. And the Magistrate Judge, in what I think is a very thorough opinion, said he failed to do that and the District Court affirmed. And we think you can, the Court can affirm that grant of summary judgment for at least three different reasons. But before you get into reasons, let me make sure, let me ask something Judge Jones did, but ask in a little bit different way to see what your answer is. Yes. Is it the position of Tesoro that none of this reporting that was at issue, regardless of reasonable belief, but insofar as the accuracy is, that none of that reporting was inaccurate or improper made to the SEC up through March of 2010, which was the actual date of the filing? And even beyond, yes. But beyond that, but that's not relevant, I think. What we're looking at now, those reports, position of Tesoro is that they were accurate and were not improperly dealing with sales taxes. That is true. We are taking that position. And as the plaintiff, Mr. Wallace, one of the prongs that Mr. Wallace has to prove for his claim is that he had a reasonable belief in a covered violation of SOX covered violation. Well, what is it then that you have spent $350 or $250 or a billion dollars on that opposing counsel was talking about? I'm not sure in the record where he's referring to that, but I think that $350 million. I don't want to be facetious about it. So what was that about? I think what he's saying is that the company upgraded its accounting system and spent money to do that. That's what I'm understanding him to say. But it wasn't because of any of these issues. To the extent they needed a new accounting system, they needed a new accounting system. But the record says what it says and so forth. Yes, it does. But I think the important thing is that he has to prove, as the plaintiff, he has to produce evidence on summary judgment showing that he had a reasonable belief that there was a violation of a law covered by SOX. He refers kind of vaguely in his brief that there was SEC misreporting. He has to show by evidence, not just allegations, that there was a reasonable belief in that. He can't do that, Your Honors, because, among other things, number one, and this is the issue I was just talking about, the SEC filings all expressly disclosed the thing that he was reporting. Well, he can't get to the jury on just disagreements about internal accounting practices or the fact that they needed an upgrade in their accounting software, right? I would agree with that, Your Honor. I mean, in this case, as it was remanded and the law requires, it's SEC, it's the disclosures to stockholders that are important. Absolutely, Your Honor. And those disclosures quite clearly disclose the very thing that he was speaking about. And they did that, I would note, by the way, that in his deposition, he admits that he wasn't even aware of the disclosures when he was reporting his findings to Ms. Jackson, who was the accountant. And he says, and this is at page 1954 of the record, 229 of his person, so turn to the particular footnote that she referred to. She was bringing up the footnotes. And he said, because I had no knowledge of the footnotes and couldn't have been responsible for that, but she brought it up. So the point I'm making from this is that he didn't even have an investigation into what the SEC filings actually said, much less that they were improper. He was looking at something different. He was looking at what he thought were misreports. And I must confirm that there really weren't any of those either. But he was not looking at SEC misreporting. And so he also, another factor which I think sort of demonstrates that he did not have a reasonable belief is what we discussed in the opening argument, and that fact is he certified on the very day that he left that he was aware of no misreporting for the years 2009. But I will say, I mean, he wasn't wasting his time here. Mr. Moreau had told him to investigate this situation, right? Mr. Lewis had told him, he was Mr. Moreau's senior, but Mr. Lewis had told him to investigate more generally profitability in different regions. He was not tasked with this particular looking at taxes and revenues. That's something that he looked at, he learned that the accounting system was recording those taxes as what some internal units were profitability, but as Ms. Jackson confirmed, in fact, it wasn't because it was being costed out in a different place that he wasn't looking at. But he was not tasked with this particular thing. This was something that the company knew about, and you could see that in Mr. Belisle's deposition where he said our external reporting unit, the folks who were responsible for SEC filings, knew about this. They confirmed that this was proper to do this and disclose it. So, and that's on page 2861 of the record. So that's the first issue, and I think that's frankly all the Court needs to get into in order to affirm this, is just to say there is no evidence here of his reasonable belief. But even that, I think beyond that, number one, we think he had no even subjective belief, because when he was doing his reporting, he said quite clearly in his email, and this is the only email in the record that has anything to do with his reporting, this is on 2833, quote, I don't think there so he's talking about his internal issues, and then he says, I don't think there is any chance that at the corporate level, this is not properly accounted for. And he confirmed in his deposition that that meant external reporting. So he didn't even have a subjective belief, but beyond that, there's no evidence, competent evidence in the record that he ever reported anything to do with SEC misfilings. He was reporting internal numbers, internal transaction data that he thought was not what it should be. You're saying that by the date he was terminated, March whatever, 2010, the investigation he was doing on what you just described, regional profit reporting, that he had not yet looked at these SEC filings, that this all comes up thereafter? He said in his meeting with Ms. Jackson, which was a few weeks before that, that he had not looked at the footnotes, and that was the point, that was the meeting in which he was So he didn't look at the footnotes, he was looking at the SEC filings, perchance? He should have, because he was a sub-certifier of the 2009 year filings, which he said meant that he was responsible for looking and alerting management to any issues. And the important thing about that is, on the very day he was terminated, he signed the certification for 2009 saying he was aware of no misreporting by the company. And he confirmed in his deposition that that was accurate, as on the day he was terminated, he was aware of no misreporting for the year 2009. So either he didn't look at them, or he looked at them and he thought they were fine. Either way, there's no reasonable belief of a covered violation. And that's what he needs to have to win his case. I think the magistrate judge is very thorough on this, but further than this, the fact that he didn't report anything with SEC filings, but there's also the fact that clear and convincing evidence showed that he would have been terminated for his serious and Judge Jones' undisputed workplace misconduct, regardless of any reporting activity. And here I think the case is pretty much on all fours, or frankly even on all fours, and that's the interesting thing with Hemphill. Now admittedly, Hemphill is an unpublished decision of this court, but the reasoning in Hemphill applies foursquare to this case. Hemphill, just like this case, was a retaliation claim. The person was retaliated, allegedly retaliated against, but the evidence showed that the people, the employee relations department that made the case, the employee relations department was investigating, and had no knowledge of his alleged reporting of any of these accounting things, had a months-long, very thorough, and very well-documented investigation that revealed, in general terms, that Mr. Wallace was a hostile, vindictive, abusive, and uncooperative manager. Those findings by the employee relations department made without knowledge are unrebutted in this summary judgment record, as the magistrate judge said. Well, that's not fair, because he did have people that he worked with who said that he was not abusive, that he was supportive, and that he was a good boss. Right. But in fact, as the magistrate judge said, and the quotes that my colleague is pointing out, are that they were talking about their experience, and that's the only experience most employees have. That's correct. Other than hearsay, so. But what they didn't rebut, and what Mr. Wallace most importantly didn't rebut, is the charges of insubordination and favoritism that he displayed to other employees. And so the people that were signing those declarations were, in fact, part of the investigation in the sense that he was found to have been unfairly favoring certain people over others, and those were the people that his declarations were from. So what the magistrate judge said is they don't dispute the specific instances, for example, him, Mr. Wallace, when he publicly, in his word, burned an employee in front of another employee. That was undisputed. The court doesn't need to get to this issue, but it's just the last in a long line of reasons why, in our view, that a summary judgment was proper in this case. I think that the court, when it remanded the first time, said that his allegations, even in his complaint, were hard to understand. I think it's now been seven years of litigation in this case, and it was time for Mr. Wallace to actually come forward with the evidence that shows that he had a reasonable belief of a covered violation, that he actually reported that violation. Okay. And what do you say about anything that Mr. Ruhle would have declared or Ms. Chesney? Okay. Starting with Mr. Ruhle, the, we think the case could be decided and should be affirmed regardless of the rule declaration, but the magistrate judge and district court properly and within their discretion excluded that because it was undisclosed expert testimony. And the magistrate judge, as Judge Southwick noted, was very careful. He went through the declaration line by line and said some of these things, the rule is talking about what a reasonable person would do, and that's an expert-type declaration. And in order, as the magistrate judge noted in his opinion, in order for something to be a properly lay testimony, it has to be based on the, what is it, the process of reasoning familiar in everyday life versus the process of reasoning which can be mastered only by specialists in the field. And that's on page 3471. This, the material that the magistrate judge struck was clearly material that Mr. Ruhle used. It showed, for example, his testimony that one looking at the SEC filings would understand the words to mean certain things, which is clearly accounting-type expert testimony. It's not based on any personal perception. Well, suppose, just suppose that is wrong because, just suppose that's wrong. Can you still get summary judgment if the rule declaration was entirely admissible? Yes. I mean, the main reason it was struck was that it was untimely, right, untimely submitted as an expert. Right. And they don't challenge that it was untimely. All they're saying is that it was appropriate for a lay person to testify, not as an expert. Right. So the answer is yes, because what Mr. Ruhle said in the declaration, at least the key part, which is page 20, paragraph 22, he said that an excise tax is different from a sales tax in that the excise tax is on a specific product. Well, the only things that the record shows that Mr. Wallace was ever looking at were taxes on motor fuel, which even if you looked at, even if you accepted Mr. Ruhle's statement, those are excise taxes. Those were fully disclosed under his view of things. Before you run out of time, what exactly was Mr. Wallace told on March 12th when he was fired? Was he given a reason for being fired? I believe he was. There was a meeting, I believe there was a termination meeting, and I think that's in the record, but he was informed, among other things, that his job had been eliminated because, frankly, I think that was to be helpful to him, to get him severance. They just said they eliminated the job? They didn't make any allegations against his behavior? I'm sorry, I don't have in my, I don't have the specifics of that statement. I think there was a, if I'm correct, and I'm getting to the end of my time, I would like to answer one of Judge Jones' questions as well, if I might, but there was a report that's at 3186, I believe that's a report of what his meeting, his termination meeting was, but I'm not absolutely sure about that. I'm not sure that it, that he's relying on what was said or wasn't said in his termination. He filed his OSHA complaint shortly thereafter, and then this case went into litigation quite quickly from there, but I believe he was informed of the reasons. Well, it seems like if he was told he was being fired for insubordination, that would make a difference, rather than saying your job's, your position has been eliminated. Yes. I don't know that it makes a difference to his case, Your Honor, but it would have, it would have made a difference, I think, to Mr. Wallace, but I think he was informed very shortly after his termination, certainly in the OSHA proceedings, what the reasons were. I understand, I believe that he was informed in a, in a post-termination session that they had as to what the reasoning was, but in terms of the job being eliminated, I think that was, they were undergoing a corporate reorganization, and my understanding, I don't have the exact site right now, but I believe that that would have given him severance payment if his job was eliminated, pursuant to that reorganization, which is something that they wanted to do for him, and just to get to your last comment about the- Make it quick. You're way over. It's fine. It's a train wreck email, which he referred to, which was Chesley. That's in our, in material. That was, frankly, the same day that he was terminated. It related to something other than what he was looking into. It's not connected directly to his, and it, most importantly, doesn't say anything about SEC misreporting. Okay. Well, we'll, thank you. Thank you, Your Honor. Mr. Renner. Let me start with a footnote in the SEC filings. It's our contention that that footnote is really inadequate, and especially if you compare it with Tracy Jackson's testimony about what is an excise tax, what is a sales tax. She simply did not have an understanding about what these terms in the SEC footnote really mean, and the investigation that Wallace was working on really uncovered that this issue is way more complicated than they had anticipated, because every state and local county municipal jurisdiction has their own set of taxes, and they're different, and they're applied differently, and the process to thread out on the granular level how much of the reported segment profits are really just the pass-through taxes is something Tesoro had no handle on. And even with the footnote, they still had a duty to make sure that their segmented profit reports were correct, and Wallace's investigation was finding that they were not. What is in the record to show us that Tesoro has responded to this erroneous reporting? You talked about this enormous expenditure of money. I don't know what that was for. Oh, yes. Jackson testified that it was $250 million at record $2720 to $21. And what's that for? That was how much upgrading the software to address this problem cost. And probably to address a lot of other needs of upgrading software? I mean, are they saying because of this footnote they needed to spend $250 million to gather the information to properly report just that? Is that what we'll find when we see that page? I don't know that it's that specific or isolated, but both Jackson and Rule explained how the outcome of Rule's management of change process was this upgrade in the accounting system, and that's how much it cost. So there's the connection. I presume with that much money at stake, probably other things were addressed too, but that's how much it cost to fix this problem and to come into compliance. Wallace was never given an opportunity to respond to these allegations that were made. He was being let go as part of a reorganization plan, but that turned out not to be true. And Sobrano admitted that it was really just a termination of just Wallace. That's at $3020 to $321 of the record. And for the record of what happened at the termination meeting, an HR staffer was there, Paul Cushon, and his statement is at $3188, where he documents that at that meeting, Wallace reported that he had been the victim of unlawful retaliation, that he had reported the retaliation just earlier that day. And still, Tesoro never put out a litigation hold, and Wallace's laptop and e-mails and the records in his office were all lost and not produced, which we think severely undercuts Tesoro's claim in this case. Well, what are the OSHA proceedings that your briefs refer to? OSHA proceedings? Well, as required by Sarbanes-Oxley, my client commenced this proceeding with an administrative complaint to OSHA, and there were a number of funds That's not the Occupational and Safety and Health Administration. It is. It is? It is. The Department of SOX gives the Department of Labor responsibility to investigate I see Department of Labor. I don't understand the occupation. Right. They must not have had enough to do. Okay. I'd be happy to explain it. No, that's okay. I understand in that context. The Secretary has assigned this task to OSHA, and they investigate 22 different whistleblower laws. Oh, well, what do you know? Okay. Thank you. Thank you, sir.